1
2
3
4
5
6
7
8                       UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   BRANDON EUGENE HUNTER,                    No.  2:22-cv-1141 DJC CKD P

12                 Plaintiff,

13        v.                                   FINDINGS AND RECOMMENDATIONS

14   BRENNEMAN, et al.,

15                 Defendants.

16

17         Plaintiff is a Sacramento County Jail inmate proceeding pro se with an action for violation

18   of civil rights under 42 U.S.C. § 1983.   This action proceeds on claims arising under the

19   Fourteenth Amendment against defendants Long, Moore, Gonzalvo, Pashetov, and Brenneman,

20   all Sacramento County Jail deputies, for excessive use of force.  Defendants' motion for summary

21   judgment is before the court.

22   I.  Summary Judgment Standard

23         Summary judgment is appropriate when it is demonstrated that there "is no genuine

24   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

25   Civ. P. 56(a).  A party asserting that a fact cannot be disputed must support the assertion by

26   "citing to particular parts of materials in the record, including depositions, documents,

27   electronically stored information, affidavits or declarations, stipulations (including those made for

28   /////

                                                 1

1  purposes of the motion only), admissions, interrogatory answers, or other materials. . ."  Fed. R.

2  Civ. P. 56(c)(1)(A).

3       If the moving party meets its initial responsibility, the burden then shifts to the opposing

4  party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita

5  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

6  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

7  of their pleadings but is required to tender evidence of specific facts in the form of affidavits,

8  and/or admissible discovery material, in support of its contention that the dispute exists or show

9  that the materials cited by the movant do not establish the absence of a genuine dispute.  See Fed.

10  R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the

11  fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

12  governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,

13  Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

14       In the endeavor to establish the existence of a factual dispute, the opposing party need not

15  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

16  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

17  trial."  T.W. Elec. Serv., 809 F.2d at 631.

18       In resolving the summary judgment motion, the evidence of the opposing party is to be

19  believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the

20  facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475

21  U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

22  obligation to produce a factual predicate from which the inference may be drawn.  See Richards

23  v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

24  (9th Cir. 1987).

25  /////

26  /////

27  /////

28  /////

2

1   II.  Plaintiff's Allegations

2          In plaintiff's first amended complaint (ECF No. 11), signed under the penalty of perjury,

3   plaintiff alleges as follows:

4          1.  On May 10, 2022,[1] while plaintiff was a pretrial detainee, a "Correctional Emergency

5   Response Team" (CERT) was ordered by Sgt. Tidwell to enter plaintiff's Sacramento County Jail

6   cell and remove plaintiff from the cell.  Defendants were all part of the team.

7          2.  Defendant Long entered the cell, hit plaintiff with a shield, pushed plaintiff with it, and

8   then used it to pin plaintiff against his bunk.

9          3.  Defendant Brenneman entered plaintiff's cell and punched plaintiff's face.

10          4.  Defendant Moore pinned plaintiff to the ground.

11          5.  Defendants Gonzalvo and Pashetov helped pin plaintiff to the ground and failed to stop

12   Brenneman from punching plaintiff.

13          6.  Plaintiff was injured in several respects including injuries to his neck, ribs, shoulders,

14   and wrists.

15   III.  Failure to Exhaust

16          Defendants assert that plaintiff failed to exhaust available administrative remedies with

17   respect to his remaining claims.  Under 42 U.S.C. § 1997(e)(a), "[n]o action shall be brought with

18   respect to prison conditions under section 1983 of this title . . . by a prisoner confined in any jail,

19   prison, or other correctional facility until such administrative remedies as are available are

20   exhausted."

21          The parties agree that on May 14, 2022, plaintiff submitted the only grievance concerning

22   the allegations in his first amended complaint.  Plaintiff wrote that on May 10, 2022, at 10:00

23   a.m., a CERT team entered his cell unannounced to extract plaintiff for a court appearance and

24   that one of the deputies punched him in the face resulting in injuries for which he received

25

26

27   [1]  In his first amended complaint, plaintiff indicates the events underlying his claim occurred May
     5, 2022.  The rest of the record reveals that the events occurred May 10.  E.g. ECF No. 46 at 48-
28   65.

3

1    treatment.  Plaintiff also indicated that he was placed in a choke hold, an allegation plaintiff does

2    not make in his first amended complaint.  ECF 41-5 at 330.

3          Plaintiff received a response from Sgt. D. Albee on May 25, 2022.  Id. at 331.  Sgt. Albee

4    wrote that he was present when plaintiff was extracted from his cell, that he had reviewed the

5    video and written documentation, that internal affairs was advised of the incident on May 23,

6    2022, and that the incident was being reviewed by jail supervisors and administrative staff.  The

7    officer indicated that, as with any incident involving use of force, "there are multiple levels of

8    review."  At the bottom of the response, a box was checked indicating that the grievance had been

9    "resolved."

10         Defendants argue this was not sufficient to exhaust administrative remedies.  They argue

11   that plaintiff should have appealed Sgt. Albee's decision to the next level which would have been

12   to the "appropriate supervisor."  ECF No. 41-5 at 319-320.   However, defendants fail to indicate

13   what purpose that would have served or that any other redress as to plaintiff's allegations could

14   have been obtained.  "[A]n inmate is required to exhaust those, but only those, grievance

15   procedures that are capable of use to obtain some relief for the action complained of."  Ross v.

16   Blake, 578 U.S. 632, 642 (2016).  Defendants fail to point to anything specific suggesting that

17   there was any relief available to plaintiff beyond that which was obtained at the first level.

18   Defendants have therefore not met their burden of establishing that they are entitled to summary

19   judgment based on the exhaustion of administrative remedies.

20   IV.  Excessive Force

21         Claims concerning excessive force against pretrial detainees arise under the Fourteenth

22   Amendment.  Castro v. Cnty. of Los Angeles, 833 F.3d 1060, 1067-68 (9th Cir. 2016) (en banc).

23   To prevail on such a claim, a plaintiff must show that the defendant's use of force was (1)

24   deliberate; and (2) objectively unreasonable.  Kingsley v. Hendrickson, 576 U.S. 389, 395-97

25   (2015).  As to the second element, objective reasonableness turns on the facts of each case, such

26   as "the relationship between the need for the use of force and the amount of force used; the extent

27   of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force;

28   the severity of the security problem at issue; the threat reasonably perceived by the officer; and

4

whether the plaintiff was actively resisting." Id. at 2473. Objective reasonableness is assessed based on the information known to the officer at the time. Id. at 2474. Defendants argue that there is no genuine issue of material fact as to whether their use of force during the May 10, 2022 cell extraction was objectively unreasonable. The court agrees.

A. Undisputed Material Facts

Defendants provided a video taken before the extraction in which the CERT team is identified and the reasons for the extraction are stated, a video recording of the cell extraction, and a video of plaintiff receiving medical care after the extraction in which plaintiff makes statements relating to the extraction. When identifying the universe of facts applicable in this section, the facts come from the videos unless otherwise stated. In his opposition, plaintiff makes some allegations, like an allegation that he never resisted his removal from his cell, which are clearly at odds with what appears on the video. The court does not address those allegations. See Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.")

B. Forcible Removal of Plaintiff From His Cell

On the day of the events at issue, Sacramento Superior Court Judge Carlton Davis ordered that Sacramento County Jail staff "remove [plaintiff] involuntarily to attend court proceedings [the same day] by whatever means necessary." ECF No. 5 at 292. The video of the events shows that prior to the extraction, Sgt. Tidwell explained that plaintiff would be extracted from his cell with force because plaintiff had a history of taking pills requiring that he go to the infirmary instead of court. Sgt. Tidwell indicated that on one occasion, plaintiff had the pills ready to ingest upon an order to exit his cell for court and then did ingest them when ordered to leave the cell. Sgt. Tidwell also said that the plan was to enter the cell quickly with an "element of surprise" and forcibly remove plaintiff from his cell without giving plaintiff the option to exit the cell voluntarily, to limit the risk of plaintiff taking pills. Plaintiff does not dispute that on prior occasions he had taken pills to avoid going to court.

5

1    The court finds on the record before the court that there is no genuine issue of material

2    fact as to whether defendants entering plaintiff's cell and using force to extract plaintiff (as

3    opposed to simply requesting that plaintiff exit his cell) was reasonable.  Plaintiff was ordered to

4    appear for court and considering plaintiff's prior attempts to avoid court when being given the

5    option of presenting himself for transport voluntarily, the use of at least some force was

6    reasonable.  Further, the assigned judge specifically ordered defendants to extract plaintiff from

7    his cell "by whatever means" necessary.  A reasonable officer would therefore conclude that the

8    use of force was not only reasonable, but required under law, and that failure to comply with a

9    court order could subject them to penalty.

10        C.  Defendant Long's Use of Shield

11    Deputy Long identified himself in the pre-extraction video as being "on the shield" for the

12    cell extraction.  The shield appears to be approximately 4 feet high and 2 feet wide, with two

13    metal handles attached to the back, and is convexly shaped away from the person using it.

14    Initially, most of the CERT team lined up behind Long to the left of plaintiff's cell out of

15    plaintiff's view.  After another officer peeked into plaintiff's cell to locate plaintiff, someone

16    noted that plaintiff was "up."  Just after that, plaintiff appeared at the cell window.  About five

17    seconds later, a member of the CERT team opened plaintiff's cell door.  Long moved toward the

18    door first behind his shield.  Seeing Long coming, plaintiff remained at the door without any

19    retreat.  As Long entered the cell he ordered plaintiff to the ground, but plaintiff refused.

20    Accordingly, Long used the shield to push plaintiff back into his cell.  While the camera lost

21    Long and plaintiff in view, it did capture the attempts of other officers to subdue plaintiff's

22    resistance inside the cell.  The camera then captured plaintiff being subdued by 4 or 5 officers

23    while the portion of his body from his buttocks upward were on his bunk face down and his legs

24    were off the bunk being held by officers.  Plaintiff continued to resist in this same position for

25    approximately 90 seconds.  At that point, the shield was being pushed onto plaintiff's back.  Long

26    then disengaged the shield and the shield was removed from the cell.  According to Long, he

27    disengaged the shield because the use of the shield prevented officers from obtaining control over

28    /////

6

1  plaintiff's arms as plaintiff kept his arms under his torso while Long pushed the shield on
2  plaintiff's back.  ECF No. 41-5 at 190.[2]

3       Shortly after the shield was disengaged, plaintiff got to his feet and continued to resist
4  violently, lashing out at the deputies for approximately 40 seconds until the deputies forced
5  plaintiff to the ground.  While on the ground plaintiff continued to resist strenuously until the
6  deputies threatened to utilize a taser on plaintiff.

7       On this record there is no genuine issue of material fact as to whether the use of the shield,
8  and the way Long used it, was objectively unreasonable. As evidenced by the fact that once Long
9  disengaged the shield it took the strength of four deputies to restrain plaintiff, the use of the shield
10  was appropriate in the situation. The only aspect of the use of the shield worthy of further
11  mention is how Long used the shield to push plaintiff toward plaintiff's bunk where plaintiff
12  appeared to land awkwardly on the front of the bunk and the bunk itself.  The court finds Long's
13  actions reasonable as the bunk was behind plaintiff as Long pushed plaintiff with the shield.
14  Plaintiff had the option of not being pushed toward the bunk by going to the ground as ordered or
15  by terminating his resistance.

16       Defendant Long is entitled to summary judgment.

17       D. <u>Pinning Plaintiff to the Ground</u>

18       Plaintiff was eventually pinned to the ground for approximately three minutes while, at
19  times, violently resisting after Long removed the shield.  When on the ground plaintiff told the
20  deputies that he could not breathe so the deputies rolled plaintiff to his side.  While plaintiff was
21  still pinned to the ground at that point, there was no weight being applied to him above his waist.
22  Eventually, plaintiff had to be dragged from his cell because he refused to stand up and walk out
23  of the cell.

24       The record before the court does not suggest a genuine issue of material fact as to whether
25  plaintiff's being pinned to the ground was objectively unreasonable.  Indeed, when plaintiff
26  complained he could not breathe, deputies changed his position on the ground.

27
28  [2]  In his opposition, plaintiff claims his arms were not buried under his torso. ECF No. 46 at 10.
Whether they were is immaterial.  What matters is that Long disengaged use of the shield.

7

1        E. <u>Punches Thrown by Brenneman</u>

2        Defendant Brenneman admits punching plaintiff four or five times in the chaos

3 immediately following the removal of the shield.  In his report concerning the incident,

4 Brenneman indicates as follows:

5             HUNTER stood up to his feet and escalated his resistance to deputies'
             efforts to control him by thrashing his body.  As HUNTER stood up
6             he stepped backwards leaving me in front of him.  I was unable to
             control HUNTER's left arm as he overpowered me and pulled his
7             arm away.  I feared HUNTER would attack me and my partners due
             to him no longer being restrained on the bunk. I punched HUNTER
8             approximately five times in the face.

9 ECF No. 41-5 at 179.  The video shows that once the shield was removed, plaintiff attempted to

10 come to his feet and was resisting.  Brenneman threw punches at plaintiff with significant force in

11 rapid succession taking less than five seconds.[3]  The court accepts Brenneman's assertion that

12 five punches landed on plaintiff's face.[4]

13        From the video taken after the incident, plaintiff appeared to have three minor abrasions

14 on his face and no noticeable swelling.  He appeared agitated, not in any pain (although at one

15 point he indicates he was in pain), and not particularly interested in medical treatment.  Plaintiff

16 said that the portion of Brenneman's hand that connected with his face was covered with a hard

17 protective plastic.  The video confirms the deputies wore gloves akin to ski gloves, and

18 Brenneman does not deny that the gloves he wore had hardened plastic covering some portion of

19 the back of the fingers and/or hands.  Construing the evidence in the light most favorable to

20 plaintiff, as the court must, the court assumes some part of the gloves were covered in hard plastic

21 and that the portion of Brenneman's hand that connected with plaintiff's face was covered with

22 hard plastic.

23        The court therefore finds that there is at least a genuine issue of material fact as to whether

24 Brenneman's punching plaintiff in the face five times with hard plastic gloves was objectively

25   [3] The punches can be viewed on the video at about 2:40.

26
27   [4] In his report, Brenneman also indicates that after the initial round of punches, plaintiff punched
Brenneman, and Brenneman punched back.  ECF No. 41-5 at 179.  To be clear, the claim which
remains concerns the first round of punches thrown by Brenneman.   In the video taken after the
28 cell extraction, plaintiff admits he punched an officer after being punched.

unreasonable.  While it was reasonable for Brenneman to attempt to restrain plaintiff, whether an affirmative attack of five punches to the face with gloves covered in hard plastic was warranted must be left to a finder of fact.

However, given the chaotic nature of the events until plaintiff was subdued, and considering the very short period that elapsed between the first and last punch, no other defendant was in a position to mind the actions of defendant Brenneman.  Therefore, the other defendants cannot be held liable for failing to stop Brenneman's punches.

F.  Qualified Immunity

Defendants assert they are entitled to summary judgment pursuant to the "qualified immunity" doctrine.  "Government officials enjoy qualified immunity from civil damages unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  In analyzing a qualified immunity defense, the court must consider the following: (1) whether the facts taken in the light most favorable plaintiff create at least a genuine issue of material fact as to whether defendant's conduct violated a constitutional right; and (2) whether the right at issue was clearly established at the time of the incident.  Saucier v. Katz, 533 U.S. 194, 201 (2001).

With respect to every defendant and claim except for plaintiff's excessive force claim against Brenneman, the court has found that there is no genuine issue of material fact as to whether any of plaintiff's constitutional rights were violated.  Therefore, the court proceeds to step 2 of the qualified immunity analysis only with respect to the claim against Brenneman.

As for step 2, existing precedent must put beyond debate whether the facts, considered in the most favorable light to plaintiff, amount to a violation of a constitutional right.  Kisela v. Hughes, 584 U.S. 100, 104 (2018).

Considering the evidence in the light most favorable to plaintiff, plaintiff, while resistant, was not attacking officers immediately before he was punched.  Defendant Brenneman was in full protective gear and had the assistance of 8 other officers, also in full protective gear, with three of /////

9

1   those officers actively attempting to restrain plaintiff.  Defendant Brenneman punched plaintiff in

2   the face five times with downward blows while wearing gloves covered in hard plastic.

3         The law is clear that correctional staff have license to react quite forcefully to subdue an

4   uncooperative or combative inmate.  <u>Madrid v. Gomez</u>, 889 F. Supp. 1146, 1254 (N.D. Cal.

5   1995).  The law is equally clear that any response must be measured.  Even when an inmate's

6   conduct warrants some use of force, "evolving norms of decency require prison officials to use

7   techniques and procedures that are both humane and restrained."  <u>Slakan v. Porter</u>, 37 F.2d 368,

8   372 (9th Cir. 1984).

9         If it were a matter of one or two punches to some other part of plaintiff's body, defendant

10  would most likely be entitled to summary judgment under the qualified immunity doctrine.

11  However, the court finds that five blows directly to the face with the other attendant

12  circumstances identified above is not the sort of required measured response identified in clearly

13  established law.  Therefore, defendant Brenneman is not entitled to summary judgment based

14  upon the qualified immunity doctrine.

15  VI.   <u>Conclusion</u>

16        For all the foregoing reasons, the court will recommend that defendants' motion for

17  summary judgment be granted in part and denied in part.

18        Accordingly, IT IS HEREBY RECOMMENDED that defendants' motion for summary

19  judgment (ECF No. 41) be granted in part and denied in part as follows:

20        1.  Denied with respect to plaintiff's remaining excessive force claim against defendant

21  Brenneman arising from Brenneman's punches to plaintiff's face.

22        2.  Granted in all other respects.

23        These findings and recommendations are submitted to the United States District Judge

24  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

25  after being served with these findings and recommendations, any party may file written

26  objections with the court and serve a copy on all parties.  Such a document should be captioned

27  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

28  objections shall be served and filed within fourteen days after service of the objections.  The

10

parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated:  August 28, 2024

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

1
hunt1141.msj